**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

<table>
<tr>
<td>

IN RE APPLICATION OF VIASAT, INC.
AND VIASAT BROADBAND
HOLDINGS B.V. FOR AN ORDER TO
TAKE DISCOVERY FOR USE IN
FOREIGN PROCEEDINGS PURSUANT
TO 28 U.S.C. § 1782

</td>
<td>

Case No.  20-MC-_____

</td>
</tr>
</table>

**MEMORANDUM OF LAW IN SUPPORT OF
PETITIONERS' APPLICATION FOR AN ORDER TO CONDUCT DISCOVERY FOR
<u>USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782</u>**

J. Stephen McAuliffe, III (Fed. Bar No. 08595)
MILES & STOCKBRIDGE, P.C.
11 N. Washington Street, Suite 700
Rockville, MD 20850-4229
301.762.1600
smcauliffe@milesstockbridge.com

Michael B. Brown (Fed. Bar No. 19641)
MILES & STOCKBRIDGE, P.C.
100 Light Street, 9th Floor
Baltimore, Maryland 21202
410.385.3663
mbbrown@milesstockbridge.com

Patrick T. Schmidt (*pro hac vice* pending)
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
213.443.3191
patrickschmidt@quinnemanuel.com

Lucas Bento (*pro hac vice* pending)
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
212.849.7552
lucasbento@quinnemanuel.com

*Counsel for Petitioners Viasat, Inc. and ViaSat
Broadband Holdings B.V.*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

I.  FACTUAL BACKGROUND......................................................................................4

    A.  The Parties .........................................................................................................4

    B.  Joint Venture......................................................................................................6

    C.  Eutelsat Breaches Framework Agreement and Shareholders Agreement To Market Konnect .................................................................................................9

    D.  Foreign Proceedings.........................................................................................13

        1.  Swiss Litigation .....................................................................................13

        2.  LCIA Arbitrations ..................................................................................14

II. LEGAL FRAMEWORK ...........................................................................................15

III. ARGUMENT .............................................................................................................17

    A.  Petitioners Satisfy the Three Statutory Requirements of 28 U.S.C. § 1782. .........17

        1.  Respondent Is "Found" in the District of Maryland. .................................18

        2.  The Discovery Sought Is for Use in Foreign Proceedings.........................18

        3.  Petitioners Are "Interested Persons.".......................................................20

    B.  All of the Discretionary Factors Under Section 1782 Strongly Weigh in Favor of Permitting the Discovery Petitioners Seek..............................................21

        1.  The First *Intel* Factor Strongly Favors Granting Discovery. ....................21

        2.  The Second *Intel* Factor Strongly Favors Granting Discovery.................22

        3.  The Third *Intel* Factor Favors Granting Discovery. ................................23

        4.  The Fourth *Intel* Factor Favors Granting Discovery................................25

IV. CONCLUSION...........................................................................................................26

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Al Fayed v. C.I.A.*,
229 F.3d 272 (D.C. Cir. 2000) ............................................... 17

*Al Fayed v. United States*,
210 F.3d 421 (4th Cir. 2000)................................................. 17

*Alexander v. FBI*,
194 F.R.D. 316 (D.D.C. 2000) ............................................... 25

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012)................................................... 17

*Chubb Ins. Co. of Eur. SE v. Zurich Am. Ins. Co.*,
09–MC–0116, 2010 WL 411323 (N.D. Ohio Jan. 28, 2010).................... 18

*DiGiulian v. Johns Hopkins Health Sys. Corp.*,
PX–19–02213, 2019 WL 5064672 (D. Md. Oct. 9, 2019)................. 17, 18, 21

*Euromepa S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995) ................................................. 23

*Goenechea v. Davidoff*,
CCB–15–3384, 2016 WL 560689 (D. Md. Feb. 11, 2016)................... 16, 21

*In re Application for an Order Permitting Metallgesellschaft AG to Take Disc.*,
121 F.3d 77 (2d Cir. 1997)................................................... 23

*In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Disc. for Use in Foreign Proceedings*,
773 F.3d 456 (2d Cir. 2014) ................................................. 19

*In re Application of Caratube Int'l Oil Co.*,
730 F. Supp. 2d 101 (D.D.C. 2010) .......................................... 22

*In re Application to Obtain Disc. for Use in Foreign Proceedings*,
939 F.3d 710 (6th Cir. 2019)................................................. 19

*In re Barnwell Enters. Ltd.*,
265 F. Supp. 3d 1 (D.D.C. 2017) ............................................ 19

*In re Chevron Corp.*,
753 F. Supp. 2d 536 (D. Md. 2010) ...................................... 19, 23

*In re Chevron Corp.*,
10–MC–00067, 2010 WL 4883111 (W.D. Va. Nov. 24, 2010)................. 23, 24

*In re del Valle Ruiz*,
939 F.3d 520 (2d Cir. 2019) ................................................. 18

*In re DiGiulian*,
314 F. Supp. 3d 1, 7 (D.D.C. 2018) .................................... 16, 22, 23

*In re Ex Parte Application of Jommi*,
    13–80212 CRB(EDL), 2013 WL 6058201 (N.D. Cal. Nov. 15, 2013) .................................. 19

*In re Gianoli Aldunate*,
    3 F.3d 54 (2d Cir. 1993) .................................................................................................. 17

*In re Malev Hung. Airlines*,
    964 F.2d 97 (2d Cir. 1992) .............................................................................................. 17

*In re Nat'l Syndicate for Elec. Energy*,
    13–MC–20 GBL/TCB, 2014 WL 130973 (E.D. Va. Jan. 14, 2014) ...................................... 16

*In re Polymer Sols. Int'l, Inc.*,
    DKC–18–1864, 2019 WL 1239778 (D. Md. Mar. 18, 2019) ................... 16, 19, 20, 22, 23, 24

*In re Request for Judicial Assistance from the Dist. Court in Svitavy, Czech*,
    748 F. Supp. 2d 522 (E.D. Va. 2010) .................................................................................. 19

*In re Top Matrix Holdings Ltd.*,
    18–MC–465(ER), 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) .............................................. 19

*In re Veiga*,
    746 F. Supp. 2d 8, 18 (D.D.C. 2010) ........................................................................ 20, 21, 25

*Infineon Techs. AG v. Green Power Techs. Ltd.*,
    247 F.R.D. 1 (D.D.C. 2005) .............................................................................................. 24

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) .................................................................................................. *passim*

*Lancaster Factoring Co. Ltd. v. Mangone*,
    90 F.3d 38 (2d Cir. 1996) ................................................................................................ 17

*Matter of de Leon*,
    19–MC–0197(TSC), 2020 WL 1047742 (D.D.C. Mar. 4, 2020) ........................................... 18

*Minatec Fin. S.A.R.L. v. SI Grp. Inc.*,
    08–CV–269(LEK/RFT), 2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) ............................... 24

*Naiad Mar. Co. v. Pac. Gulf Shipping Co.*,
    RDB–16–4006, 2017 WL 511903 (D. Md. Feb. 8, 2017) ..................................................... 25

*Oncology Found. v. Avanza Dev. Servs., LLC*,
    PX–17–1445, 2017 WL 2376769 (D. Md. May 30, 2017) ................................................... 20

*Servotronics, Inc. v. Boeing Co.*,
    954 F.3d 209 (4th Cir. 2020) .................................................................................... 17, 19

*Skycasters, LLC v. Hughes Network Sys., LLC*,
    05-CV-2360, 2006 WL 8454316 (N.D. Ohio Jan. 20, 2006) ................................................ 18

*Weber v. Finker*,
    554 F.3d 1379 (11th Cir. 2009) ........................................................................................ 19

## Statutory Authorities

28 U.S.C. § 1782 .................................................................................................. *passim*

Petitioners Viasat, Inc. ("Viasat") and ViaSat Broadband Holdings B.V. ("VBH") respectfully submit this Memorandum of Law in support of their Application pursuant to 28 U.S.C. § 1782 ("Section 1782") for an order authorizing discovery from Hughes Network Systems LLC ("Respondent" or "Hughes"), in the form of the attached subpoena *duces tecum* and subpoena *ad testificandum* (the "Subpoenas") (the "Application").[1]

## INTRODUCTION

This Application arises from a dispute between Petitioners, their joint venture partner, Eutelsat S.A. ("Eutelsat"), and their joint venture vehicle, Euro Broadband Infrastructure Sàrl ("EBI"). The dispute arose as a result of Eutelsat's deliberate actions to undermine and otherwise convert the property of the joint venture by, for example, causing EBI to enter into arrangements that are not in that company's best interests. Such arrangements include forcing EBI to enter into a technology supply agreement with Respondent ("HNS Supply Agreement") that was invalidly approved by EBI's Eutelsat-dominated board in order to use joint-venture money to procure equipment which will only (and substantially) benefit Eutelsat. Petitioners seek information relating to the HNS Supply Agreement for use in foreign proceedings pending in Switzerland and England ("Foreign Proceedings").

In 2017, Viasat, through its wholly-owned subsidiary VBH, entered into a joint venture agreement with Eutelsat to expand satellite broadband service offerings in Europe. A near-term goal of the joint venture agreement was for Viasat to provide both an infusion of capital and its direct-to-consumer retail expertise to help Eutelsat better monetize its existing "KA-SAT" internet satellite, which Eutelsat had launched in 2010. Prior to the joint venture, Eutelsat struggled to market KA-SAT services directly to customers and had a significant amount of unsold capacity.

---

[1]   The proposed subpoenas are attached as Exhibit 2 to the Declaration of Lucas Bento accompanying the Application.

The framework agreement governing the joint venture called for Eutelsat to contribute the KA-SAT satellite itself as well as its related business in exchange for 51% of the shares in EBI, and Viasat (through VBH) to contribute €132.5 million in exchange for the remaining 49% of the shares in the joint venture.  Both parties agreed to take all reasonable steps to ensure that EBI obtained the full benefit and enjoyment of the assets, know-how, supplier and customer information of the KA-SAT satellite and its accompanying businesses, including encouraging customers and suppliers to deal with and work exclusively with EBI.

Despite those covenants and agreements underpinning the joint venture ("Joint Venture Agreements"), in April 2018, Eutelsat unilaterally announced that it would launch its own high capacity internet satellite called Konnect VHTS.[2]  Eutelsat further announced that Konnect VHTS will operate outside the joint venture.  It will thus directly compete with EBI's KA-SAT satellite. Pending Konnect VHTS's entry into commercial service in either 2021 or 2022, Eutelsat successfully launched into space a different satellite in January 2020, called Konnect.  Starting around September 2020, Eutelsat expects to use Konnect to compete directly with EBI's KA-SAT satellite in at least 15 European countries.

Since announcing its intention to pursue the Konnect VHTS project, Eutelsat has deliberately failed to meet its obligations and has instead pursued its own interests to market a competitor product to the detriment of EBI and Petitioners.  In doing so, Eutelsat and EBI's directors designated by Eutelsat ("Eutelsat-Appointed Directors") have not only violated their own contractual and statutory duties, but have also put EBI in breach of its legal obligations. Specifically, Eutelsat, the Eutelsat-Appointed Directors, and EBI have failed to meet their contractual obligations, covenants and statutory duties by, among other examples, (1)

---

[2] "VHTS" stands for "very high-throughput satellite" and is a moniker applied to the latest generation of internet satellites that have significantly more bandwidth than prior generations.

misappropriating EBI's capital, confidential information, distributor relationships and trade secrets for Eutelsat's benefit and to promote the "Konnect" business, (2) forcing EBI to market KA-SAT capacity under Eutelsat's "Konnect" brand, and (3) siphoning EBI's surplus funds to Eutelsat's benefit.

Most recently, on December 11, 2019, EBI's Eutelsat-dominated board invalidly approved the HNS Supply Agreement whereby Hughes would supply EBI with new ground and end-user equipment for the KA-SAT satellite.[3]   Petitioners believe that the HNS Supply Agreement is entirely unnecessary to operate KA-SAT, will clearly result in negative financial returns to EBI, and thus is not in EBI's best interest.   However, the HNS Supply Agreement will directly benefit Eutelsat by at least: (i) making it considerably easier for Eutelsat to steal EBI's customers and transition them from the KA-SAT satellite to either Konnect or Konnect VHTS at minimal cost, and (ii) making Eutelsat's independent commercial offerings, such as its offerings to European aviation customers, significantly more attractive by granting Eutelsat access to capacity on the KA-SAT satellite.

In light of these and other significant breaches, Petitioners have commenced multiple actions in the courts of the Canton of Vaud in Switzerland ("Swiss Litigation") and also initiated two arbitration proceedings seated in London, England under the LCIA arbitration rules ("LCIA Arbitrations").   Petitioners now file this application pursuant to Section 1782 to seek discovery from Hughes regarding the HNS Supply Agreement and the circumstances leading to its formation, which has, to date, not been shared with Petitioners.

---

[3] Generally speaking, ground equipment refers to highly specialized equipment like large antennas that are used to connect the satellite to the internet backbone.  End-user equipment refers to equipment that allows a user, like a residential internet customer, to communicate with the satellite.  End-user equipment for an internet satellite often includes a consumer modem, antenna and parabolic dish.

This Application meets all of the requirements of Section 1782. Hughes "resides or is found" in this District because it maintains its principal place of business in Germantown, Maryland. The discovery sought by the Petitioners is directly relevant to the issues at stake in the Swiss Litigation and LCIA Arbitrations because it calls for the HNS Supply Agreement itself (and information related to such Agreement), which is a significant example of the breaches by Eutelsat, the Eutelsat-Appointed Directors, and EBI of their contractual and statutory obligations.

Each of the discretionary factors laid down by the Supreme Court in *Intel Corp. v Advanced Micro Devices, Inc*., 542 U.S. 241 (2004) also favors the discovery sought by Petitioners: Hughes is not a defendant in the foreign proceedings and is not subject to the subpoena power of either foreign tribunal; the foreign tribunals would be receptive to the aid sought here; the discovery here does not seek to avoid any foreign restriction on gathering evidence; and the requests are carefully circumscribed to avoid any undue burden.

Petitioners therefore respectfully request that the Court grant Petitioners' Application and permit Petitioners to serve the Subpoenas on Hughes.

## I.     FACTUAL BACKGROUND

### A.     The Parties

*Petitioner Viasat, Inc. ("Viasat")* is a satellite operator based in Carlsbad, California, with offices in Switzerland and elsewhere in Europe. Viasat provides satellite internet services throughout the world.[4] Viasat is a claimant in the LCIA Arbitrations.[5]

---

[4]  Werlen Decl. ¶ 12.
[5]  Werlen Decl. ¶¶ 49–50.

*Petitioner ViaSat Broadband Holdings B.V. ("VBH")* is a wholly-owned subsidiary of Viasat and is incorporated under the laws of the Netherlands, with its principal offices in Amsterdam, Netherlands.[6]  VBH is a claimant in the LCIA Arbitrations and the Swiss Litigation.[7]

*Respondent Hughes Network Systems LLC ("Hughes")* is a U.S.-based provider of satellite internet products and services, with headquarters in Germantown, Maryland.[8]  Upon information and belief, Hughes is a wholly owned subsidiary of EchoStar.[9]  Hughes is not a party to the Foreign Proceedings.[10]

*Eutelsat S.A.* **("Eutelsat")** is a French satellite operator and operates a fleet of satellites, the majority of which are dedicated to providing broadcast television services.[11]  A small number of Eutelsat's satellites are used to provide satellite internet service capacity on a worldwide basis.[12]  Eutelsat is incorporated as a limited liability company (*société anonyme*) under the laws of France, with headquarters in Paris, France.[13]  Eutelsat is a respondent and adverse party to Viasat and/or VBH in the LCIA Arbitrations and in the Swiss Litigation.[14]

*Euro Broadband Infrastructure Sàrl ("EBI")* is a Swiss limited liability company with offices and headquarters in Eysins, Switzerland.[15]  EBI owns an internet satellite (referred to as KA-SAT) and markets and sells satellite internet service capacity to wholesale distributors who, in turn, sell the capacity to end-users such as residential consumers or commercial airlines.[16]  EBI

---

[6]  Werlen Decl. ¶ 13.
[7]  Werlen Decl. ¶¶ 41–44, 49–52.
[8]  Werlen Decl. ¶ 14.
[9]  Werlen Decl. ¶ 14.
[10]  Werlen Decl. ¶¶ 41–44, 49–52.
[11]  Werlen Decl. ¶ 15.
[12]  Werlen Decl. ¶ 15.
[13]  Werlen Decl. ¶ 15.
[14]  Werlen Decl. ¶¶ 41–44, 49–52.
[15]  Werlen Decl. ¶ 16.
[16]  Werlen Decl. ¶ 16.

was established on January 22, 2016 as a joint venture company between Viasat (through VBH) and Eutelsat; Eutelsat holds 51% of the shares in EBI and VBH holds the remaining 49%.[17]

## B.    Joint Venture

In 2010, Eutelsat launched a satellite called KA-SAT, which allowed Eutelsat to provide satellite broadband internet services to residential consumers at scale.[18]   The KA-SAT satellite has used Viasat ground equipment exclusively since at least 2010, when the KA-SAT satellite first became fully operational.[19]   However, for many years after it entered commercial service, Eutelsat struggled to market the satellite's capabilities to consumers and faced major difficulties in selling KA-SAT capacity in Europe.   Indeed, almost three quarters of KA-SAT's capacity remained unsold by 2016.[20]

Viasat, on the other hand, had gathered significant expertise selling satellite internet services directly to consumers through its successful consumer business in the United States, and had also developed state-of-the-art equipment and infrastructure (modems, gateways, and consumer equipment) required to provide such services.[21]   Moreover, Viasat was sufficiently capitalized to make the necessary investments to acquire a large retail residential customer base.[22]

As a result, in February 2017, in order to combine Eutelsat's existing (and largely unsold) satellite capacity with Viasat's direct-to-consumer expertise and significant deployable capital, Eutelsat and Viasat entered into a joint venture project, in which they created two joint venture companies—EBI and Euro Broadband Retail Sàrl ("EBR").[23]   When Eutelsat and Viasat joined

---

[17]   Werlen Decl. ¶ 16.
[18]   Werlen Decl. ¶ 17.
[19]   Werlen Decl. ¶ 17.
[20]   Werlen Decl. ¶ 17.
[21]   Werlen Decl. ¶ 18.
[22]   Werlen Decl. ¶ 18.
[23]   Werlen Decl. ¶ 19.  Though not particularly relevant to the present dispute, EBR was originally formed to be used as the direct retail arm of the joint venture project.  EBR was to buy satellite internet packages from EBI and then re-sell this KA-SAT capacity directly to residential consumers. The initial shareholding in EBR was 51% Viasat, and

forces in February 2017 they executed a full set of joint venture and related service agreements, including an Amended and Restated Framework Agreement dated February 9, 2017 between Eutelsat, Viasat, Viasat Europe Sàrl (f/k/a EBR), VBH, and EBI ("Framework Agreement") as well as a shareholders agreement dated March 3, 2017 ("Shareholders Agreement").[24]

Under the Framework Agreement, Eutelsat transferred ownership of the KA-SAT satellite and all of the other assets comprising the KA-SAT broadband business (including its customer portfolio and other commercial assets) (the "EBB Business Assets") to form EBI. Eutelsat then sold a 49% ownership stake of EBI's shares to Petitioners for €132.5 million (approximately USD $141.1 million).[25]   Eutelsat currently owns 51% of EBI whereas Viasat, through VBH, owns 49%.[26]   In the consumer market, EBI is supposed to manage the satellite capacity of KA-SAT and sell it, along with requisite consumer premises equipment (such as a satellite dish and modem), in packages to wholesale distributors.[27]   These distributors in turn sell the capacity and equipment to residential consumers in Europe as end-users.[28]   Furthermore, EBI operates in the mobility market by selling wholesale capacity to Viasat, which in turn distributes the capacity principally to its large commercial airline customers in Europe such as Finnair, SAS, and El-Al.[29]   Viasat provides its mobility customers with the requisite equipment needed to send a receive signals to KA-SAT, such as the antenna and radome that are installed on the top of an airliner's fuselage.[30]

Under the Framework Agreement, Eutelsat covenanted to both Viasat and EBI to take all reasonable steps to ensure that EBI and Viasat Europe Sàrl obtained the full benefit and enjoyment

---

49% Eutelsat.  Today, it is wholly owned by Viasat following a sale by Eutelsat of its shares in EBR to Viasat in 2018. The entity is now known as Viasat Europe Sàrl.  Werlen Decl. ¶ 20.
[24]   Werlen Decl. ¶ 21.
[25]   Werlen Decl. ¶ 22.
[26]   Werlen Decl. ¶ 23.
[27]   Werlen Decl. ¶ 24.
[28]   Werlen Decl. ¶ 24.
[29]   Werlen Decl. ¶ 25.
[30]   Werlen Decl. ¶ 25.

of that EBB Business Assets that Eutelsat had transferred to EBI.[31]  This expressly included, for example, encouraging customers and suppliers of the EBB Business to deal with EBI rather than Eutelsat.[32]  The Framework Agreement also imposed confidentiality obligations on the parties, such that neither party was permitted to use information it obtained from EBI other than for the purpose of managing or monitoring its investment.[33]

Additionally, Petitioners and Eutelsat entered into the Shareholders Agreement which governs the composition and procedures of the board of EBI, which is composed of six board members, with three members nominated by each of Eutelsat and Viasat.[34]  The Chairman, who casts the deciding vote in the event of a tie, is nominated by the majority shareholder, Eutelsat.[35]  However, the Shareholders Agreement (as well as EBI's organizational regulations) requires that certain material matters be approved not only by a majority vote of the board, but also have the support of at least one EBI director designated by Eutelsat and one EBI director designated by Viasat ("Material EBI Board Matters").[36]  In other words, the Chairman could not be used as the tie-breaker and cast the deciding vote to approve Material EBI Board Matters.[37]  Material EBI Board Matters include "Material Contracts," which are defined as those where a party would expect to pay €15 million or more over the life of the contract, or any transaction or agreement with a shareholder or affiliate (i.e. Eutelsat or Viasat).[38]

---

[31]   Werlen Decl. ¶ 26.
[32]   Werlen Decl. ¶ 26.
[33]   Werlen Decl. ¶ 26.
[34]   Werlen Decl. ¶ 27.
[35]   Werlen Decl. ¶ 27.
[36]   Werlen Decl. ¶ 27.
[37]   Werlen Decl. ¶ 27.
[38]   Werlen Decl. ¶ 27.

**C.** **Eutelsat Breaches Framework Agreement and Shareholders Agreement To Market Konnect**

Despite its obligations to EBI, beginning in April 2018, Eutelsat used its majority control of EBI to embark on a systematic and persistent scheme to (i) exploit EBI's KA-SAT broadband business to enable Eutelsat to more quickly and profitably establish a competing business under Eutelsat's Konnect brand name and (ii) simultaneously damage Viasat's own nascent satellite broadband business in Europe.[39]

First, in April 2018, Eutelsat unilaterally announced that it would launch, outside the joint venture, its own, new satellite called Konnect VHTS which is to compete directly with EBI's KA-SAT satellite.[40]  Eutelsat also plans to use another new satellite called Konnect to provide capacity in Europe at least until Eutelsat's Konnect VHTS satellite becomes operational, currently expected to occur in 2021 or 2022.[41]  Eutelsat successfully launched Konnect on 15 January 2020, and it is expected to enter commercial service in September 2020.[42]  Eutelsat's Konnect satellite competes directly with EBI's KA-SAT satellite in at least 15 European countries.[43]

Eutelsat then directed that EBI take certain steps to increase the value of Eutelsat's Konnect brand and facilitate the imminent launch of the respective Eutelsat services, when those steps had no benefit, and indeed diminished, the KA-SAT broadband business, and were therefore in breach of Eutelsat's covenants under the Framework Agreement.[44]  Three of the most egregious examples of how Eutelsat has inappropriately used EBI as its own vehicle to promote Konnect include:

- Installing EBI's CEO and other executives, through secondment arrangements, to misappropriate and provide EBI's confidential information to Eutelsat, including EBI's

---

[39] Werlen Decl. ¶ 28.
[40] Werlen Decl. ¶ 29.
[41] Werlen Decl. ¶ 30.
[42] Werlen Decl. ¶ 30.
[43] Werlen Decl. ¶ 30.
[44] Werlen Decl. ¶ 31.

9

proprietary customer lists. Eutelsat's employees even accessed EBI's confidential database of distributors to misappropriate that customer list for Eutelsat's own purposes to encourage those distributors to switch to Eutelsat's Konnect brand.[45]

- Directing EBI to actively promote and market Eutelsat's Konnect brand, despite having no approval to do so and despite Eutelsat's Konnect broadband business being a direct competitor of EBI's KA-SAT broadband business, by requiring EBI's distributors to sell KA-SAT capacity under the Konnect brand, by marketing the Konnect brand on EBI-affiliated social media platforms, and by preparing EBI presentations, handouts, and marketing materials with "Konnect" or "Eutelsat" branding rather than EBI's own branding. [46]

- Directing EBI to invest and launch a preferred partnership program, without informing EBI's board members about the conditions and financial terms of that program, and with the express purpose of using significant amounts of EBI's cash to set up a network of distributors to sell Eutelsat's Konnect capacity.[47]

In addition to those significant steps to violate the Framework Agreement, and most importantly for this 1782 Application, on December 11, 2019, EBI's board voted on a proposal to conclude an agreement (*i.e.* the HNS Supply Agreement) with Hughes for EBI to buy and install HNS ground equipment and consumer premises equipment.[48]  The EBI directors designated by Viasat voted against such proposal and Viasat claims that the HNS Supply Agreement has never been validly approved by EBI's Eutelsat-dominated board.[49]  Viasat believes that the ground

---

[45]   Werlen Decl. ¶ 32.
[46]   Werlen Decl. ¶ 32.
[47]   Werlen Decl. ¶ 32.
[48]   Werlen Decl. ¶ 33.
[49]   Werlen Decl. ¶ 34.

equipment supplied under the HNS Supply Agreement is entirely unnecessary, has not been commercially or technically justified, will clearly result in negative financial returns to EBI, and is being procured to benefit Eutelsat's competing Konnect platform.[50]

Moreover, Petitioners believe that Eutelsat and EBI's management deliberately misrepresented to the EBI board that that the total value of the HNS Supply Agreement is below the €15 million threshold which would otherwise render it a "Material Contract," thereby requiring support from at least one EBI board member nominated by Viasat in order to be approved.[51]  For example, Eutelsat presented financial projections to the EBI board that contained material and inaccurate statements and unrealistic assumptions about the costs and value of the HNS Supply Agreement, including statements that were designed to reduce the overall value of the contract.[52] As a result, Petitioners believe that the HNS Supply Agreement is actually a Material Contract and has never been validly approved according to the Shareholders Agreement and EBI's organizational regulations.[53]  Contrary to EBI's statements, Petitioners also believe that Eutelsat contacted Hughes to procure the contract rather than EBI being "cold-called" by Hughes, as EBI has falsely represented previously.[54]

At Eutelsat's direction, EBI intends to pay millions for the privilege of installing Hughes' unnecessary and redundant equipment on KA-SAT, which will have a number of devastating effects on EBI's business.  First, by equipping KA-SAT with Hughes equipment, Eutelsat will ensure the equipment on KA-SAT is fully compatible and interoperable with the Hughes equipment on its own Konnect satellites.  Thus, once KA-SAT has Hughes equipment, Eutelsat

---

[50] Werlen Decl. ¶ 34.
[51] Werlen Decl. ¶ 35.
[52] Werlen Decl. ¶ 36.
[53] Werlen Decl. ¶ 37.
[54] Werlen Decl. ¶ 37.

can siphon away EBI retail customers with minimal effort or expense because the same Hughes equipment already in those EBI customers' homes will seamlessly connect with Eutelsat's Konnect satellites.[55]  The installation of Hughes' equipment on KA-SAT will also permit Eutelsat to make its Konnect offerings significantly more attractive to mobility customers, such as major commercial airlines.  This will happen in one of two ways.  Eutelsat's forthcoming Konnect satellite has limited coverage of Europe, and thus cannot provide a commercially attractive service to airlines on a stand-alone basis.[56]  If Hughes ground equipment is also installed on KA-SAT, a commercial airliner connected to the Konnect satellite using Hughes equipment will be able to automatically "roam" onto KA-SAT when it leaves Konnect's coverage area, thereby using KA-SAT capacity to fill what would otherwise be commercially unacceptable coverage gaps in Eutelsat's coverage of European flight paths.[57]

Alternatively, by equipping KA-SAT with Hughes equipment Eutelsat could simply use KA-SAT to serve its airline customers because KA-SAT has complete European coverage, thereby avoiding the need to reserve any capacity on Konnect for its mobility customers (which only covers 15 European countries) and allowing Eutelsat to get into the mobility market years earlier than would otherwise be possible if it were forced to wait for the successful launch of its Konnect VHTS satellite, which will be Eutelsat's first internet satellite having both coverage of all of Europe and sufficient capacity to provide viable service to airlines.[58]

Given these significant implications for the joint venture and Viasat's shareholdings therein, Petitioners' 1782 Application seeks discovery from Hughes about the HNS Supply

---

[55]  Werlen Decl. ¶ 38.
[56]  Werlen Decl. ¶ 39.  This is because commercial airlines need to ensure comprehensive coverage of as many of their flight routes as possible.  An airline will not buy a connectivity service intended to cover its European flight routes where a large number of those flights will take planes outside of the provider's coverage area.
[57]  Werlen Decl. ¶ 39.
[58]  Werlen Decl. ¶ 40.

Agreement and the circumstances leading to its execution.  On May 4, 2020, Petitioners requested

a copy of the HNS Supply Agreement from EBI.  Just days before this Application was filed, EBI,

through its counsel, refused to produce the HNS Supply Agreement.

###### D.    Foreign Proceedings

###### 1.    Swiss Litigation

After the EBI board meeting in December 2019, during which a vote on the HNS Supply

Agreement was taken, Viasat and VBH filed several claims in the courts of the Canton of Vaud in

Switzerland for claims arising out of violations of Swiss corporate law by EBI, Eutelsat and current

and former Eutelsat-designated EBI directors and officers (*i.e.* the Swiss Litigation).[59]

On December 19, 2019, VBH issued a request for conciliation in the courts in the Canton

of Vaud, Switzerland against current and former EBI directors and officers designated by Eutelsat

based on claims that they have breached their fiduciary duties to EBI under Swiss corporate law.

Such a request for conciliation is a mandatory and integral first step in virtually all Swiss civil

litigations.[60]

On February 10, 2020, VBH filed a request for conciliation in the courts in the Canton of

Vaud, Switzerland against Eutelsat based on Eutelsat's breaches of its duty of loyalty to EBI and

VBH under Swiss corporate law.[61]  On that same day, VBH also filed an application for interim

relief against EBI in the courts of the Canton of Vaud, Switzerland seeking to prevent EBI from

implementing the Board's invalid decision approving the HNS Supply Agreement.[62]  On April 2,

2020, VBH filed a corresponding conciliation action on the merits against EBI in the courts of the

---

[59]   Werlen Decl. ¶ 41.
[60]   Werlen Decl. ¶¶ 42–43; Roux Decl. ¶ 11.
[61]   Werlen Decl. ¶ 44.
[62]   Werlen Decl. ¶ 44.

Canton of Vaud, Switzerland seeking the declaration that the aforementioned Board decision was null and void.[63]

On March 9, 2020, Eutelsat filed a response to the February 10 request for conciliation, including a counterclaim against VBH.[64]

With the exception of the request for interim relief, all these proceedings of the Swiss Litigation are currently in the stage of conciliation and due to the COVID-19 pandemic, conciliation hearings have yet to take place.[65]

The Swiss Court does not have subpoena power over Hughes and has not issued any order preventing the discovery sought here from being used in those Swiss Proceedings.[66]

### 2. LCIA Arbitrations

In addition to the Swiss Litigation, Viasat and VBH have filed two arbitration requests under the London Court of International Arbitration Rules 2014 ("LCIA Rules") arising out of EBI and Eutelsat's contractual breaches of the Framework Agreement and the Shareholders Agreement (*i.e.* the LCIA Arbitrations).[67]

*First*, on March 11, 2020, pursuant to an arbitration agreement set out in the Shareholders' Agreement dated March 3, 2017, Viasat and VBH jointly filed a Request for Arbitration under the LCIA Rules against Eutelsat and EBI.[68]  Viasat and VBH seek declarations that Eutelsat and EBI both acted unlawfully and are in breach of the terms of the Shareholders Agreement, including by invalidly approving the HNS Supply Agreement, a declaration that Eutelsat unlawfully acquired and used confidential information belonging to EBI and Viasat, and seeking damages from

---

[63]   Werlen Decl. ¶ 46.
[64]   Werlen Decl. ¶ 45.
[65]   Werlen Decl. ¶ 46.
[66]   Werlen Decl. ¶¶ 47–48.
[67]   Werlen Decl. ¶ 49.
[68]   Werlen Decl. ¶ 50.

Eutelsat for losses caused by those breaches.  Eutelsat and EBI each filed their responses on April 8, 2020.[69]

*Second*, on April, 14, 2020, Viasat and VBH filed a second, related request for arbitration, also under the LCIA Rules, against Eutelsat and EBI based on the arbitration agreement set out in the separate Framework Agreement, and asserted claims against Eutelsat and EBI for breaches by Eutelsat and EBI of the Framework Agreement, including by invalidly approving the HNS Supply Agreement.[70]  Eutelsat and EBI each filed their responses on May 12, 2020.[71]  Neither arbitral tribunal has been constituted.[72]  Viasat and VBH intend to consolidate the two proceedings, which will be seated in London, England.[73]

The LCIA Arbitration under the Shareholders' Agreement will be governed by Swiss law and the LCIA Arbitration under the Framework Agreement will be governed by English law.  As English-seated arbitrations, the law of the forum (or *lex arbitri*) of the LCIA Arbitrations is English law, which means that any award rendered by the arbitral tribunals must be challenged pursuant to English law.[74]

Neither arbitral tribunal has subpoena power over Hughes, nor has either tribunal issued any order preventing the discovery sought here from being used in those proceedings.[75]

## II.   LEGAL FRAMEWORK

Section 1782 of Title 28 of the United States Code permits United States District Courts to grant discovery for use in a foreign proceeding.  The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use

---

[69]   Werlen Decl. ¶ 51.
[70]   Werlen Decl. ¶ 52.
[71]   Werlen Decl. ¶ 51.
[72]   Werlen Decl. ¶ 54.
[73]   Werlen Decl. ¶ 55.
[74]   Werlen Decl. ¶ 56; Brocklebank Decl. ¶¶ 25, 33.
[75]   Brocklebank Decl. ¶ 30.

in a proceeding in a foreign or international tribunal . . . .  The order may be made . . .
upon the application of any interested person.

28 U.S.C. § 1782.

An application made pursuant to Section 1782 must satisfy three statutory requirements:
(1) the person from whom discovery is sought must reside in or be found within the district; (2)
the discovery must be for use in a proceeding before a foreign or international tribunal; and (3) the
application must be made by a foreign or international tribunal or any interested person.  *See In re
Polymer Sols. Int'l, Inc.*, DKC–18–1864, 2019 WL 1239778, at *4 (D. Md. Mar. 18, 2019); *In re
Nat'l Syndicate for Elec. Energy*, 13–MC–20 GBL/TCB, 2014 WL 130973, at *2 (E.D. Va. Jan.
14, 2014); *In re DiGiulian*, 314 F. Supp. 3d 1, 6 (D.D.C. 2018).  A foreign proceeding need not
have actually commenced at the time when Section 1782 discovery is sought; it need only "be
within reasonable contemplation."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241,
259 (2004); *Goenechea v. Davidoff*, CCB–15–3384, 2016 WL 560689, at *2 (D. Md. Feb. 11,
2016).

After determining that the three statutory requirements are satisfied, courts may then
consider four discretionary factors in deciding whether to grant a Section 1782 application,
namely: (i) whether the documents or testimony sought are within the foreign tribunal's
jurisdictional reach, and thus accessible absent Section 1782 aid; (ii) "the nature of the foreign
tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign
government or the court or agency abroad to U.S. federal-court judicial assistance"; (iii) whether
the Section 1782 request "conceals an attempt to circumvent foreign proof-gathering restrictions
or other policies of a foreign country or the United States"; and (iv) whether the subpoenas contain
unduly intrusive or burdensome requests.  *See Intel*, 542 U.S. at 264–65.

Courts in the Fourth Circuit consider these discretionary factors in light of the statute's "twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Al Fayed v. United States*, 210 F.3d 421, 424 (4th Cir. 2000) (quoting *In re Malev Hung. Airlines*, 964 F.2d 97, 100 (2d Cir. 1992)); *see DiGiulian v. Johns Hopkins Health Sys. Corp.*, PX–19–02213, 2019 WL 5064672, at *1 (D. Md. Oct. 9, 2019).  The Supreme Court and courts in other circuits have acknowledged a congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings.  *See, e.g.*, *Intel*, 542 U.S. at 247–48; *Al Fayed v. C.I.A.*, 229 F.3d 272, 276 (D.C. Cir. 2000) (acknowledging that "successive amendments, since the statute's origin in 1855, have given [Section 1782] 'increasingly broad applicability.'" (citing *Lancaster Factoring Co. Ltd. v. Mangone*, 90 F.3d 38, 41 (2d Cir. 1996))); *see also Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) ("[T]he statute has, over the years, been given 'increasingly broad applicability." (quoting *In re Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir. 1993))); *cf. Servotronics, Inc. v. Boeing Co.*, 954 F.3d 209, 215 (4th Cir. 2020) ("broaden[ing] 'discovery' or access to information in foreign arbitrations to an extent not available in U.S. arbitration . . . is the result of Congress' purposeful decision to authorize U.S. district courts to provide assistance to foreign tribunals as a matter of public policy.").

## III.    ARGUMENT

### A.    Petitioners Satisfy the Three Statutory Requirements of 28 U.S.C. § 1782.

Petitioners satisfy the three statutory requirements of Section 1782: (1) Respondent resides and is "found" in the District of Maryland; (2) the requested information is "for use" in the pendent "foreign proceedings"; and (3) Petitioners are "interested persons" as the claimants in the foreign proceedings.

**1.      Respondent Is "Found" in the District of Maryland.**

A corporate respondent is "found" in a district for purposes of Section 1782 where it has its principal place of business, is incorporated, or where it is otherwise "at home." *See In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019) ("§ 1782's 'resides or is found' language extends to the limits of personal jurisdiction consistent with due process."); *Matter of de Leon*, 19–MC–0197 (TSC), 2020 WL 1047742, at *2 (D.D.C. Mar. 4, 2020); *DiGiulian*, 2019 WL 5064672, at *1 ("The discovery is sought from a non-profit corporation found in Baltimore, Maryland").  Hughes has its global headquarters in Germantown, Maryland.[76]  Indeed, Hughes has been deemed subject to general jurisdiction in this district before. *See, e.g., Skycasters, LLC v. Hughes Network Sys., LLC*, 05-CV-2360, 2006 WL 8454316, at *1–2 (N.D. Ohio Jan. 20, 2006) (finding a Maryland court would have jurisdiction over Hughes in part based on its headquarters in Germantown, Maryland).  Thus, Hughes "resides" and is "found" here.

**2.      The Discovery Sought Is for Use in Foreign Proceedings.**

The LCIA Arbitrations and Swiss Proceedings both qualify as adjudicative proceedings "in a foreign or international tribunal" for purposes of Section 1782 because they both exhibit all the hallmarks of traditional judicial proceedings by acting as a first-instance decision-maker tasked with resolving evidentiary disputes, collecting and reviewing evidence in order to resolve those disputes, and permitting certain of its decisions to be appealed and become subject to further review. *Intel*, 542 U.S. at 257–59; Roux Decl. ¶¶ 11–26; Brocklebank QC Decl. ¶¶ 18–31.

Indeed, numerous courts have found that proceedings before Swiss courts satisfy the requirements of Section 1782. *See, e.g., Chubb Ins. Co. of Eur. SE v. Zurich Am. Ins. Co.*, 09–MC–0116, 2010 WL 411323, at *6 (N.D. Ohio Jan. 28, 2010) (authorizing Section 1782 discovery

---

[76]   Werlen Decl. ¶ 14.

for use before the Commercial Court of Zurich); *In re Top Matrix Holdings Ltd.,* 18–MC–465 (ER), 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020) (same).[77]

Likewise, numerous courts have found that LCIA arbitrations qualify as "foreign proceedings." *See, e.g.*, *In re Application to Obtain Disc. for Use in Foreign Proceedings*, 939 F.3d 710, 723, 729–30 (6th Cir. 2019); *In re Children's Inv. Fund Found. (UK)*, 363 F. Supp. 3d 361, 369–70 (S.D.N.Y. 2019); *Servotonics*, 954 F.3d at 213–14 (holding similar private arbitration in the UK was a proceeding in a foreign or international tribunal for purposes of Section 1782).

Petitioners are not required to show that the information sought would be discoverable or admissible in the Foreign Proceedings. *Intel*, 542 U.S. at 260 ("[N]othing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there."); *In re Polymer Sols. Int'l, Inc.*, 2019 WL 1239778, at *6 ("§ 1782 does not impose a foreign-discoverability requirement."); *In re Chevron Corp.*, 753 F. Supp. 2d 536, 540 (D. Md. 2010) ("§ 1782 contains no requirement that evidence sought from a federal court be discoverable under the law governing the foreign proceeding."); *In re Request for Judicial Assistance from the Dist. Court in Svitavy, Czech*, 748 F. Supp. 2d 522, 527 (E.D. Va. 2010) ("To delve into the merits of litigation pending before a foreign tribunal would be a breach of international comity.  Indeed, the Supreme Court has instructed that the district courts are to refrain from delving into the similarly technical question of discoverability under foreign laws in considering a § 1782 request for judicial assistance."); *In re Barnwell Enters. Ltd.*, 265 F. Supp. 3d 1, 11 (D.D.C. 2017) ("[S]ection 1782 does not require that the material sought in

---

[77]   *See also In re Ex Parte Application of Jommi*, No. C 13–80212 CRB (EDL), 2013 WL 6058201, at *1, *5 (N.D. Cal. Nov. 15, 2013) (authorizing Section 1782 discovery for criminal proceeding in Switzerland); *In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Disc. for Use in Foreign Proceedings*, 773 F.3d 456, 462 (2d Cir. 2014) (finding that Swiss criminal investigation was "exactly the type of proceeding that the statute [was] intended to reach"); *Weber v. Finker*, 554 F.3d 1379, 1381, 1384 (11th Cir. 2009) (same).

the United States be discoverable—or even admissible—in the foreign tribunals."). Indeed, Petitioners are only required to make a "de minimis" showing that the evidence sought is relevant to the Foreign Proceedings. *See In re Polymer Sols. Int'l, Inc.*, 2019 WL 1239778, at *4 (granting application where petitioners argued only that "it made the requisite *de minimis* showing of relevance and possible use in the potential litigation"); *In re Veiga*, 746 F. Supp. 2d 8, 14, 18 (D.D.C. 2010) (granting application where petitioners made "*prima facie* showing and its conclusion that the discovery sought in fact relates to claims and defenses").

Here, Petitioners plainly satisfy this requirement.  The information sought in the Subpoenas is highly material to the Foreign Proceedings because it relates to, among other things, the value of the HNS Supply Agreement between the joint venture company EBI and Hughes and the circumstances leading up to its execution, as well as Eutelsat's procurement of Hughes' products and services to benefit Eutelstat's competing Konnect satellite—matters which are at the heart of both foreign proceedings.[78]  Petitioners will be able to introduce evidence obtained via this 1782 Application in the LCIA Arbitrations and also the Swiss Litigation.[79]

### 3.      Petitioners Are "Interested Persons."

Finally, Section 1782 requires persons seeking discovery to show that they possess a sufficient interest in the foreign proceedings.  While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, there is "[n]o doubt litigants are included among, and may be the most common example of, the interested persons who may invoke § 1782."  *Intel*, 542 U.S. at 256; *Oncology Found. v. Avanza Dev. Servs., LLC*, PX–17–1445, 2017 WL 2376769, at *1 (D. Md. May 30, 2017) (holding that "a party to the [foreign] litigation" is an

---

[78]  *See* Bento Decl., Ex. 2 (Subpoenas); Werlen Decl. ¶¶ 60–61; Brocklebank QC, ¶¶ 8–12, 32; Roux Declaration, ¶¶ 28–32.
[79]  Werlen Decl. ¶¶ 62–63; Brocklebank QC, ¶¶ 33–37; Roux Declaration, ¶¶ 24, 32.

"interested person"); *In re Veiga*, 746 F. Supp. 2d at 17 ("Applicants are all 'interested persons' within the meaning of § 1782(a) as litigants in the proceedings at issue."). Petitioners are claimants in (and thus parties to) the Foreign Proceedings.[80]  As such, Petitioners are plainly "interested person[s]" under Section 1782.

### B.   All of the Discretionary Factors Under Section 1782 Strongly Weigh in Favor of Permitting the Discovery Petitioners Seek.

Once the threshold requirements under Section 1782 are met, the Court considers the four discretionary "*Intel* factors."  Each of these factors weighs in favor of granting the requested discovery here.  *First*, Respondent is not a party to the Foreign Proceedings.  *Second*, there is no reason to believe that the Foreign Proceedings would be unreceptive to evidence obtained through Section 1782 discovery, and indeed, the discovery sought is directly relevant to those proceedings. *Third*, Petitioners are acting in good faith and are not seeking to avoid any foreign restriction on gathering evidence.  *Fourth*, the requests are carefully circumscribed to avoid any undue burden.

### 1.   The First *Intel* Factor Strongly Favors Granting Discovery.

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding.  "[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."  *Intel*, 542 U.S. at 264; *DiGiulian*, 2019 WL 5064672, at *2 (finding the person from whom discovery was sought was "not a party to the [foreign] action and thus not subject to the jurisdiction of the [foreign] Court, rendering the [U.S.] Court's assistance essential"); *Goenechea*, 2016 WL 560689, at *3 ("[person from whom discovery was sought] is not a participant in the foreign proceeding, which

---

[80]   Werlen Decl. ¶¶ 41–44, 49–52.

makes the need for § 1782 assistance greater because nonparticipants may be outside the jurisdiction of the foreign tribunal").

Here, Respondent is not a party to the Foreign Proceedings. As noted above, the only parties to the LCIA Arbitrations are VBH, and Viasat, as claimants, and EBI and Eutelsat as respondents; VBH and EBI are the only parties to the Swiss Litigation.[81] Respondent Hughes is a non-participant in the Foreign Proceedings and beyond the jurisdiction of both the LCIA tribunal and Swiss court.[82] Accordingly, the foreign tribunals do not have subpoena power over Hughes, and Petitioners require this Court's assistance to obtain discovery over Respondent to produce documents and testimony.

### 2. The Second *Intel* Factor Strongly Favors Granting Discovery.

Under the second *Intel* factor, this Court should look to whether the foreign tribunal would be receptive to evidence obtained through Section 1782. "Courts within the Fourth Circuit . . . have applied the general approach that, in the absence of a foreign court's clear rejection of the assistance, the § 1782 application should be granted." *In re Polymer Sols. Int'l, Inc.*, 2019 WL 1239778, at *6; *In re DiGiulian*, 314 F. Supp. 3d at 8 (holding that a court should deny 1782 discovery on the basis of lack of receptiveness only where it is provided with "*authoritative proof* that [the] foreign tribunal would reject evidence obtained with the aid of section 1782" and noting that "it is not necessary to conduct an 'extensive examination of foreign law regarding the existence and extent of discover[y] in the forum country'"(quoting *In re Application of Caratube Int'l Oil Co.*, 730 F. Supp. 2d 101, 105 (D.D.C. 2010))). "[A] respondent must demonstrate a 'clear directive' or 'authoritative proof that [the] foreign tribunal would reject evidence obtained with the aid of section 1782,' such as "'judicial, executive or legislative declarations that

---

[81] Werlen Decl. ¶¶ 41–44, 49–52.
[82] Roux Decl. ¶ 18; Brocklebank QC Decl. ¶¶ 17, 30.

specifically address the use of evidence gathered under foreign procedures.'" *In re Chevron Corp.*, 10–MC–00067, 2010 WL 4883111, at *3 (W.D. Va. Nov. 24, 2010) (second alteration in original) (quoting *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995)).

As explained in the declaration of Francois Roux, a former judge in the very same court where the Swiss Litigation is pending, the Swiss Courts will likely be receptive to evidence obtained as a result of this Application as the evidence is directly relevant to the Swiss Litigation.[83] Likewise, the LCIA tribunal, once constituted, would be able to consider evidence presented by Petitioners in the LCIA Arbitrations.[84]

### 3.    The Third *Intel* Factor Favors Granting Discovery.

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 265.   In *Intel*, the Supreme Court expressly rejected the notion that Section 1782 requires the evidence be discoverable in the foreign proceeding itself, and other district courts have added that an applicant need not show the specific documents or testimony sought would be admissible abroad.  *See id.* at 260; *In re Polymer Sols. Int'l, Inc.*, 2019 WL 1239778, at *6 ("§ 1782 does not impose a foreign-discoverability requirement."); *In re Chevron Corp.*, 753 F. Supp. 2d at 540 ("§ 1782 contains no requirement that evidence sought from a federal court be discoverable under the law governing the foreign proceeding.").  Nor is a Section 1782 applicant required to first exhaust its remedies in the foreign court.  *See In re DiGiulian*, 314 F. Supp. 3d at 8–9 ("[L]itigants are not required to seek discovery through the foreign tribunal prior to requesting through the United States." (citation omitted)); *In re Application for an Order Permitting Metallgesellschaft AG to Take Disc.*, 121 F.3d 77, 79 (2d Cir. 1997) ("[A] 'quasi-

---

[83]   Roux Decl. ¶¶ 25–32.
[84]   Brocklebank QC Decl. ¶¶ 32–37.

exhaustion requirement,' finds no support in the plain language of [Section 1782] and runs counter to its express purposes."). The issue is solely whether the discovery is being sought in bad faith. *See In re Chevron Corp.,* 2010 WL 4883111, at *3.

Here, there is no reason to believe that any of the discovery sought violates public policy. And it is not being sought in bad faith. While Petitioners recognize that Hughes is a direct competitor, 1782 discovery is not being sought for the purpose of obtaining any customer account information, trade secrets, or privileged communications. Petitioners merely seek documents and communications about the HNS Supply Agreement, and, in particular, to assess Eutelsat's motives and conduct, as well as the overall valuation of the contract. These issues are directly related to the Swiss Proceedings and LCIA Arbitrations. Swiss law, which governs one of the LCIA Arbitrations and the Swiss Proceedings, does not have any law or public policy against such discovery.[85]   Nor does England, the seat of the Arbitration.[86]

Moreover, if Respondent believes that any responsive documents present such concerns, Petitioners are prepared to stipulate to the entry of a protective order sufficient to protect Hughes' information. Such measures have been deemed acceptable in many other 1782 cases and would be sufficient here. *See, e.g.*, *In re Polymer Sols. Int'l, Inc.*, 2019 WL 1239778, at *10 (issuing protective order to protect trade secrets and maintain confidentiality of information); *Minatec Fin. S.A.R.L. v. SI Grp. Inc.*, Civ. 08–CV–269 (LEK/RFT), 2008 WL 3884374, at *9 (N.D.N.Y. Aug. 18, 2008) ("[T]he beauty of § 1782 is that it permits [a] Court to impose a protective order that would extinguish any concern that privileged, confidential, or proprietary information would be indecorously revealed."); *Infineon Techs. AG v. Green Power Techs. Ltd.*, 247 F.R.D. 1, 2 (D.D.C.

---

[85]   Roux Decl. ¶¶ 25–32.
[86]   Brocklebank QC Decl. ¶¶ 32–37.

2005) (granting modification of protective order allowing Section 1782 applicant to use discovery in related proceedings).

### 4.      The Fourth *Intel* Factor Favors Granting Discovery.

The fourth *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265.  The standard is substantially the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure.  *See Naiad Mar. Co. v. Pac. Gulf Shipping Co.*, RDB–16–4006, 2017 WL 511903, at \*3 n.6 (D. Md. Feb. 8, 2017) ("applications for judicial assistance pursuant to 28 U.S.C. § 1782 are also subject to Rule 26"); *In re Veiga*, 746 F. Supp. 2d at 19 ("[T]he standards for discovery set out in the Federal Rules of Civil Procedure also apply when discovery is sought under § 1782(a)."). This inquiry encompasses "the relevance of the requested discovery to the foreign proceeding."  *In re an Order Pursuant to 28 U.S.C. §1782 to Conduct Disc. for Use in a Foreign Proceeding*, 17–1466 (BAH), 2017 WL 3708028, at \*4 (D.D.C. Aug. 18, 2017) (citing *In re Veiga*, 746 F. Supp. 2d at 19).  Relevancy in this context "is broadly construed and encompasses any material that bears on, or that reasonably leads to other matters that could bear on, any issue that is or may be in the case." *Alexander v. FBI*, 194 F.R.D. 316, 325 (D.D.C. 2000).  "When relevance is in doubt, the district court should be permissive." *In re Veiga*, 746 F. Supp. 2d at 19.

Here, the requests in the Subpoenas are narrowly tailored, temporally limited, and directly relevant to questions at issue in the Foreign Proceedings.  Specifically, Petitioners make only three document requests, all of which are directly relevant and highly material to proving that the HNS Supply Agreement is a material contract, as well as establishing Eutelsat's and EBI's motives for entering the agreement. Petitioners set out the specific relevance of each request in the Appendix

to Thomas Werlen's Declaration.[87]   Discovery also may reveal that Eutelsat has misrepresented critical facts, such as whether Eutelsat initiated the contract negotiations with Hughes, or whether EBI's management "independently" sought Hughes out.  Whatever burden Respondent may incur by producing the requested discovery, it is both modest and proportionate given the circumstances.

## IV.    CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court (a) grant the Application And Petition For An Order To Conduct Discovery; (b) enter the Proposed Order; (c) authorize Petitioners, pursuant to 28 U.S.C. § 1782, to serve the Subpoenas upon Respondent; and (d) grant any and all other relief to Petitioners as is deemed just and proper.

Dated: May 15, 2020

Respectfully submitted,

/s/ *Michael B. Brown*

J. Stephen McAuliffe, III (Fed. Bar No. 08595)
MILES & STOCKBRIDGE, P.C.
11 N. Washington Street, Suite 700
Rockville, MD 20850-4229
301.762.1600
smcauliffe@milesstockbridge.com

Michael B. Brown (Fed. Bar No. 19641)
MILES & STOCKBRIDGE, P.C.
100 Light Street, 9th Floor
Baltimore, Maryland 21202
410.385.3663
mbbrown@milesstockbridge.com

Patrick T. Schmidt (*pro hac vice* pending)
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
213.443.3191
patrickschmidt@quinnemanuel.com

Lucas Bento (*pro hac vice* pending)
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor

---

[87]   Werlen Decl. ¶ 61 and Appendix A (Relevancy Chart).

New York, New York 10010
212.849.7552
lucasbento@quinnemanuel.com

*Counsel for Petitioners Viasat, Inc. and ViaSat Broadband Holdings B.V.*