UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE APPLICATION OF VIASAT, INC. AND VIASAT BROADBAND HOLDINGS B.V. FOR AN ORDER TO TAKE DISCOVERY FOR USE IN A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782 | Case No. 20-MC _____ |

## DECLARATION OF PROF. DR. THOMAS WERLEN

I, Thomas Werlen, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1.  I submit this declaration in support of Viasat, Inc., and ViaSat Broadband Holdings B.V. ("Viasat" or "Petitioners")'s Application and Petition For An Order To Conduct Discovery For Use In A Foreign Proceeding Pursuant To 28 U.S.C. § 1782 ("1782 Application"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the 1782 Application and accompanying Memorandum of Law.

2.  Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents, including the proposed subpoenas; and (c) information supplied to me by the Petitioners or its officers, directors, and employees, or professionals retained by them.

3.  All exhibits attached hereto are true and accurate copies, or true and accurate excerpts of those copies. Where an exhibit is in a foreign language a certified translation is provided.

I.      **BACKGROUND AND QUALIFICATIONS**

4.      I am the Managing Partner of Quinn Emanuel Urquhart & Sullivan (Schweiz) GmbH based in Zurich, Switzerland. Quinn Emanuel is a global law firm focused on litigation and dispute resolution.

5.      I am also a Professor at the University of St. Gallen where I, *inter alia*, lecture corporate law and corporate governance.

6.      I hold lic. iur. and Dr. iur. degrees in law from the University of Zurich and a Master's Degree from Harvard Law School.

7.      I have been a member of the Zurich bar since 1991 and a member of the New York bar since 1997.

8.      Before joining Quinn Emanuel in 2012, from 2006 I have been the Group General Counsel and a member of the Executive Committee for Novartis. Acting in this capacity, I oversaw a global team of over 750 people spread across 140 jurisdictions, covering all areas of litigation affecting a multinational company in the heavily regulated pharmaceutical industry.

9.      Before Novartis, I have been a partner at Allen Overy based at its global HQ in London from 2001 to 2005.

10.     Before joining Allen & Overy, I was an associate at Davis Polk & Wardwell in London from 2000 to 2001, and an associate with Cravath, Swaine & Moore in New York from 1995 until 2000.

11.     My practice focuses on complex litigation and arbitration as well as corporate investigations, often involving multiple jurisdictions.

## II.     RELEVANT PARTIES

12.     ***Viasat, Inc.*** ("Viasat") is a satellite operator based in Carlsbad, California, with offices in Switzerland and elsewhere in Europe. Viasat provides satellite internet services throughout the world (**Exhibits 1, 2 and 3**).

13.     ***Viasat Broadband Holdings B.V.*** ("VBH") is a 100% subsidiary of Viasat and a company (*besloten vennootschap*) incorporated under the laws of the Netherlands, having its seat at Zuidplein 126 WTC Toren H, 1077 XV, Amsterdam, the Netherlands (**Exhibit 4**).

14.     ***Hughes Network Systems LLC*** ("Hughes") is a U.S.-based provider of satellite internet products and services, including ground equipment for satellite internet services. Hughes' global headquarters are in Germantown, Maryland (**Exhibit 5**). Upon information and belief, Hughes is a wholly owned subsidiary of EchoStar Corporation, a Colorado-based global provider of satellite communication solutions.

15.     ***Eutelsat S.A.*** ("Eutelsat") is a French satellite operator and operates a fleet of 39 satellites, the majority of which are dedicated to providing broadcast television services (**Exhibits 6 and 8**). A small number of Eutelsat's satellites are used to provide satellite internet service capacity on a worldwide basis (**Exhibit 6**). Eutelsat is incorporated as a limited liability company (*société anonyme*) under the laws of France, with headquarters in Paris, France (**Exhibit 6**).

16.     ***Euro Broadband Infrastructure Sàrl*** ("EBI") is a Swiss LLC with offices and seat at Route de Crassier 7, NYON, Business Park, 1262 Eysins, Switzerland (**Exhibit 7**). EBI owns an internet satellite (referred to as KA-SAT) and markets and sells satellite internet service capacity to wholesale distributors who, in turn, sell the capacity to end-users such as residential consumers or commercial airlines (**Exhibits 7 and 8)**. EBI was established on January 22, 2016 as a joint

3

venture company between Viasat (through VBH) and Eutelsat; Eutelsat holds 51% of the shares in EBI and Viasat (through VBH) holds the remaining 49% (**Exhibit 9**).

### III.  VIASAT'S JOINT VENTURE WITH EUTELSAT

17. In 2010, Eutelsat launched a satellite called KA-SAT, and through it provided satellite broadband internet services to residential consumers at scale (**Exhibits 8 and 9**). The KA-SAT satellite has used Viasat ground equipment exclusively since at least 2011, when the KA-SAT satellite first became fully operational (**Exhibits 8 and 9**). However, for many years after it entered commercial service, Eutelsat struggled to market the satellite's capabilities to consumers and faced major difficulties in selling KA-SAT capacity in Europe (**Exhibit 10**). Indeed, almost three quarters of KA-SAT's capacity remained unsold by 2016 (**Exhibit 10**).

18. Viasat had gathered significant expertise selling satellite internet services directly to consumers through its successful consumer business in the United States, and had also developed state-of-the-art equipment and infrastructure (modems, gateways, and consumer equipment) required to provide such services (**Exhibits 9 and 11**). Viasat was also sufficiently capitalized to make the necessary investments to acquire a large residential customer base (**Exhibits 9 and 11**).

19. In February 2017, in order to combine Eutelsat's existing (and largely unsold) satellite capacity with Viasat's direct-to-consumer expertise, ready-to-install technology and state-of-the-art ground equipment for consumer broadband internet access, and significant deployable capital, Eutelsat and Viasat entered into a joint venture project, in which they created two joint venture companies—EBI and Euro Broadband Retail Sàrl ("EBR") (**Exhibits 8 and 9**).

20. Though not particularly relevant to the present dispute, EBR was originally formed to be used as the direct retail arm of the joint venture project. EBR was to buy satellite internet

packages form ECI and then re-sell satellite these internet packages using KA-SAT capacity directly to residential consumers (**Exhibits 8 and 12**). The initial shareholding in EBR was 51% Viasat through VBH, and 49% Eutelsat (**Exhibits 8 and 12**). Today, it is wholly owned by Viasat through VBH following a sale by Eutelsat of its shares in EBR to Viasat in 2018, and is now known as Viasat Europe Sàrl (**Exhibits 8 and 12**).

21. When Eutelsat and Viasat joined forces in February 2017 they executed a full set of joint venture and related service agreements, including an Amended and Restated Framework Agreement dated February 9, 2017 between Eutelsat, Viasat, Viasat Europe Sàrl (f/k/a EBR), VBH, and EBI ("Framework Agreement") (**Exhibit 8**). They also executed a shareholders agreement dated March 3, 2017 ("Shareholders Agreement") (**Exhibit 13**).

22. Under the Framework Agreement, Eutelsat transferred ownership of the KA-SAT satellite and all of the other assets comprising the KA-SAT broadband business (including its customer portfolio and other commercial assets) (the "EBB Business Assets") to form EBI (**Exhibit 8**). Eutelsat then sold a 49% ownership stake of EBI's shares to Petitioners for €132.5 million (approximately USD $141.1 million) (**Exhibits 8, 9 and 14**).

23. Eutelsat currently owns 51% of EBI whereas Viasat through VBH owns 49% (**Exhibits 7 and 14**).

24. In the Residential Consumers market, EBI is supposed to manage the satellite capacity of KA-SAT and sell it, along with requisite consumer premises equipment (such as a satellite dish and modem), in packages to wholesale distributors (**Exhibits 8 and 13**). These distributors in turn sell the capacity and equipment to residential consumers in Europe as end-users (**Exhibits 8 and 13**).

25. EBI operates in the Mobility Customer market by selling wholesale capacity to Viasat, which in turn distributes the capacity principally to its large commercial airline customers such as Finnair, SAS, and El-Al (**Exhibits 8, 13 and 15**). Viasat provides its Mobility Customers with the requisite equipment needed to send and receive signals from KA-SAT, such as the antenna and radome that is installed on the top of an airliner's fuselage (**Exhibits 8 and 13**).

26. Under the Framework Agreement, Eutelsat covenanted to both Viasat and EBI to take all reasonable steps to ensure that EBI and Viasat Europe obtained the full benefit and enjoyment of that EBB Business Assets that Eutelsat had transferred to EBI (**Exhibit 8**). This expressly included, for example, encouraging customers and suppliers of the EBB Business to deal with EBI rather than Eutelsat (**Exhibit 8**). The Framework Agreement also imposed confidentiality obligations on the parties, such that neither party was permitted to use information it obtained from EBI other than for the purpose of managing or monitoring its investment (**Exhibits 8**).

27. Viasat and Eutelsat also entered into the Shareholders Agreement which, *inter alia*, governs the composition and procedures of the board of EBI, which is composed of six board members, with three members nominated by each of Eutelsat and Viasat (**Exhibit 13**). The Chairman, who casts the deciding vote in the event of a tie, is nominated by the majority shareholder, Eutelsat (**Exhibit 13**). However, the Shareholders Agreement and also EBI's organizational regulations also requires that certain material matters be approved not only by a majority vote of the board, but also have the support of at least one EBI director designated by Eutelsat and one EBI director designated by Viasat ("Material EBI Board Matters") (**Exhibits 13 and 16**). In other words, the Chairman could not be used as the tie-breaker and cast the deciding vote to approve Material EBI Board Matters (**Exhibits 13 and 16**). Material EBI Board Matters includes "Material Contracts," which are defined as those where a party would expect to pay €15

million or more over the life of the contract, or any transaction or agreement with a shareholder or affiliate (*i.e.* Eutelsat or Viasat) (**Exhibits 13 and 16**).

## IV.   EUTELSAT BREACHES AGREEMENTS TO MARKET KONNECT SATELLITE

28.   In the foreign proceedings (see, in detail, below paras. 41 et seqq.), Viasat submits that Eutelsat, despite its obligations to EBI, beginning in April 2018, used its majority control of EBI to embark on a systematic and persistent scheme to (i) exploit EBI's KA-SAT broadband business to enable Eutelsat to more quickly and profitably establish a competing business under Eutelsat's Konnect brand name and (ii) simultaneously damage Viasat's own nascent satellite broadband business in Europe (**Exhibit 17, 24, 25, 28 and 31**).

29.   First, Viasat believes that in April 2018, Eutelsat unilaterally announced that it would launch, outside the joint venture, its own, new satellite called "Konnect VHTS" which is to compete directly with EBI's KA-SAT satellite (**Exhibit 17**).

30.   Viasat believes that Eutelsat plans to use another new satellite called "Konnect" to provide capacity in Europe at least until Eutelsat's Konnect VHTS satellite becomes operational, currently expected to occur in 2021 or 2022 (**Exhibits 19 (p. 5 and 12) and 20 (p. 97)**). Eutelsat successfully launched Konnect on 15 January 2020, and it is expected to enter commercial service starting in September 2020. (**Exhibit 18**). Viasat shows that Eutelsat's Konnect satellite competes directly with EBI's KA-SAT satellite in at least 15 European countries (**Exhibit 24, 25, 28 and 31**).

31.   In the foreign proceedings (see, in detail, below paras. 41 et seqq.), Viasat further shows that Eutelsat then directed that EBI take certain steps to increase the value of Eutelsat's Konnect brand and facilitate the imminent launch of the respective Eutelsat services, when those

steps had no benefit, and indeed diminished, the KA-SAT broadband business, and were therefore in breach of Eutelsat's covenants under the Framework Agreement (**Exhibit 8**).

32. The foreign proceedings (see, in detail, below paras. 41 et seqq.), inter alia, describe three examples of how Eutelsat inappropriately use EBI as its own vehicle to promote Konnect include: (1) Installing EBI's CEO and other executives, through secondment arrangements, to misappropriate and provide EBI's confidential information to Eutelsat, including EBI's proprietary customer lists. Eutelsat's employees even accessed EBI's confidential database of distributors to misappropriate that customer list for Eutelsat's own purposes to encourage those distributors to switch to Eutelsat's Konnect brand; (2) Directing EBI to actively promote and market Eutelsat's Konnect brand, despite having no approval to do so and despite Eutelsat's Konnect broadband business being a competitor of EBI's KA-SAT broadband business, by requiring distributors to sell KA-SAT capacity under the Konnect brand, by marketing the Konnect brand on EBI-affiliated social media platforms, and by preparing presentations, handouts, and marketing materials with "Konnect" or "Eutelsat" rather than "EBI" branding; and (3) Directing EBI to invest and launch a preferred partnership program, without informing EBI's board members about the conditions and financial terms, and with the express purpose of using significant amounts of EBI's cash to set up a network of distributors to sell Eutelsat's Konnect capacity (**Exhibits 24, 25, 28 and 31**).

33. On December 11, 2019, EBI's board voted on a proposal to conclude an agreement with Hughes (the "HNS Supply Agreement") for EBI to buy and install ground equipment and consumer premises equipment supplied by Hughes (the "HNS Ground Equipment") (**Exhibits 21 (p. 137 et seqq.), 22 and 23).**

34. The EBI directors designated by Viasat voted against such proposal and Viasat claims that the HNS Supply Agreement has never been validly approved by EBI's Eutelsat-

dominated board. (**Exhibit 21 (p. 137 et seqq.)**). Viasat believes that based on the limited information provided to the EBI board to date, the HNS Ground Equipment supplied under the HNS Supply Agreement is entirely unnecessary, not commercially or technically justified, will clearly result in negative financial returns to EBI, and is being procured to benefit Eutelsat's competing Konnect platform (**Exhibits 21 (p. 137 et seqq.), 22 and 23**).

35.  Moreover, Petitioners believe that EBI's Eutelsat-designated board members (including the chairman of EBI's board) and EBI's management represented to the EBI board that the total value of the HNS Supply Agreement is below the €15 million threshold which would otherwise render it a Material Contract, thereby requiring support from at least one EBI board member designated by Viasat in order to be approved (**Exhibits 13, 16 and 21 (p. 137 et seqq.), 22 and 23**).

36.  For example, Viasat believes that EBI's management – guided by Eutelsat – presented financial projections to the EBI board that contained material and inaccurate statements and unrealistic assumptions about the costs and value of the HNS Supply Agreement, including that were designed to reduce the overall value of the contract (**Exhibits 21 (p. 137 et seqq.), 22 and 23**).

37.  Accordingly, Petitioners believe that the HNS Supply Agreement is actually a Material Contract that according to the Shareholders Agreement and EBI's organizational regulations has never been validly approved. Contrary to EBI's statements, Petitioners also believe that Eutelsat has contacted Hughes to procure the contract rather than EBI being "cold-called" by Hughes, as EBI have represented previously (**Exhibit 21 (p. 137 et seqq.)**).

38.  Viasat further describes in the foreign proceedings that at Eutelsat's direction, EBI intends to pay millions for the privilege of installing Hughes' unnecessary and redundant

equipment on KA-SAT, which will have a number of devastating effects on EBI's business (**Exhibit 21 (p. 137 et seqq.)**). First, Viasat believes that by equipping KA-SAT with Hughes equipment, Eutelsat will ensure the equipment on KA-SAT is fully compatible and interoperable with the Hughes equipment on its own Konnect satellites. Thus, Viasat believes that once KA-SAT has Hughes equipment, Eutelsat can siphon away EBI retail customers with minimal effort or expense because the same Hughes equipment already in those EBI customers' homes will seamlessly connect with Eutelsat's Konnect satellites (**Exhibit 21 (p. 137 et seqq.)**).

39. The Petitioners believe that the installation of Hughes' equipment on KA-SAT will also permit Eutelsat to make its Konnect offerings significantly more attractive to mobility customers, such as commercial airlines. The foreign proceedings describe that this will happen in one of two ways. Eutelsat's forthcoming Konnect satellite has limited coverage of Europe, and thus cannot provide an commercially attractive service to airlines on a stand-alone basis. If Hughes ground equipment is also installed on KA-SAT, a commercial airliner connected to the Konnect satellite using Hughes equipment will be able to automatically "roam" onto KA-SAT when it leaves Konnect's coverage area, thereby using KA-SAT capacity to fill what would otherwise be commercially unacceptable coverage gaps in Eutelsat's coverage of European flight paths (**Exhibit 21 (p. 137 et seqq.)**).

40. Alternatively, Viasat believes that by equipping KA-SAT with Hughes equipment, Eutelsat could also offer total coverage of European airspace using just KA-SAT, thereby avoiding the need to reserve any capacity on Konnect for its mobility customers (which only covers 15 European countries) and allowing Eutelsat to get into the market years earlier than would otherwise be possible if it were forced to wait for the successful launch of Konnect VHTS, which will be

Eutelsat's first internet satellite that has both coverage of all of Europe and sufficient capacity to provide viable service to airlines. (**Exhibit 21 (p. 137 et seqq.)**).

## V. FOREIGN PROCEEDINGS

### A. Swiss Litigation

41. Following the EBI board meeting in December 2019, during which also a vote on the HNS Supply Agreement was taken, Viasat and VBH filed several claims in the courts of the Canton of Vaud in Switzerland for claims arising out of violations of Swiss corporate law by EBI, Eutelsat and against current and former EBI directors designated be Eutelsat("Swiss Litigation").

42. Switzerland is made up of 26 cantons, but since 2011 there is a harmonized Federal civil procedure law which equally applies to all 26 cantons. In the normal course of most civil actions on the merits in Switzerland, a civil action must in most cases first undergo mandatory conciliation proceedings, which give the parties a simple and cost-effective method to mediate and potentially settle the case. If no settlement is reached, the plaintiff may initiate formal court proceedings within a certain time after the closing of the conciliation proceedings. A request for conciliation is a mandatory and integral first step in virtually all Swiss civil litigation.

43. On December 19, 2019, VBH issued a request for conciliation in the courts in the Canton of Vaud, Switzerland against current and former EBI directors designated by Eutelsat and officers based on claims that they have breached their fiduciary duties to EBI under Swiss corporate law (**Exhibit 24**).

44. On February 10, 2020, VBH filed a request for conciliation in the courts in the Canton of Vaud, Switzerland against Eutelsat based on Eutelsat's breaches of its duty of loyalty to EBI and VBH under Swiss corporate law (**Exhibit 25**). On that same day, VBH also filed an application for interim relief against EBI in the courts in the Canton of Vaud, Switzerland seeking

11

to prevent EBI from implementing the Board's invalid decision approving the HNS Supply Agreement (**Exhibit 26**).

45. On April 2, 2020, VBH filed a corresponding conciliation action on the merits against EBI in the courts in the Canton of Vaud, Switzerland seeking the declaration that the Board decision to approve the HNS Supply Agreement was null and void (**Exhibits 27**). On March 9, 2020, Eutelsat filed a response to the February 10 request for conciliation, including a counterclaim against VBH.

46. With the exception of the request for interim relief described above, all these proceedings of the Swiss Litigation are currently in this stage of conciliation and due to the COVID-19 pandemic, conciliation hearings have yet to take place.

47. Swiss courts do not normally have subpoena power over entities that do not reside or are not located in Switzerland.

48. None of the Swiss courts in the Canton of Vaud involved in the Swiss Litigation have issued any order preventing the discovery sought here from being used in those Swiss Proceedings.

**B.    LCIA Arbitrations**

49. Viasat and VBH have also filed two arbitration requests under the London Court of International Arbitration Rules 2014 ("LCIA Rules") arising out of EBI and Eutelsat's contractual breaches of the Framework Agreement and the Shareholders Agreement ("LCIA Arbitrations") (**Exhibits 8 and 13**).

50. On March 11, 2020, pursuant to an arbitration agreement set out in the Shareholders' Agreement dated March 3, 2017, Viasat and VBH jointly filed a Request for Arbitration under the LCIA Rules against Eutelsat and EBI (**Exhibit 28**). Viasat and VBH seek declarations that Eutelsat and EBI both acted unlawfully and are in breach of the terms of the

Shareholders Agreement, including by invalidly approving the HNS Supply Agreement; a declaration that Eutelsat unlawfully acquired and used confidential information belonging to EBI and Viasat; and seeking damages from Eutelsat for losses caused by those breaches. *Id.*

51. Eutelsat and EBI each filed their responses to that request for arbitration on April 8, 2020 (**Exhibits 29 and 30**).

52. On April, 14, 2020, Viasat and VBH filed a second, related request for arbitration, also under the LCIA Rules, against Eutelsat and EBI based on the arbitration agreement set out in the separate Framework Agreement, and asserted claims against Eutelsat and EBI for breaches by Eutelsat and EBI of the Framework Agreement, including by invalidly approving the HNS Supply Agreement (**Exhibit 31**).

53. Eutelsat and EBI each filed their responses to that request for arbitration on May 12, 2020 (**Exhibits 32 and 33**).

54. Neither arbitral tribunal has been constituted.

55. Viasat and VBH intend to consolidate the two proceedings, which will be seated in London, England (**Exhibit 34**).

56. As an English seated arbitration, the lex of the forum (or *lex arbitri*) is English law, which means that any award rendered by the tribunals must be challenged pursuant to English law.[1]

57. The LCIA Arbitration under the Shareholders' Agreement will be governed by Swiss law and the LCIA Arbitration under the Framework Agreement will be governed by English law (**Exhibits 8 (Article 20) and 13 (Article 24.1)**).

58. Neither arbitral tribunal has subpoena power over Hughes.

---

[1] Here I refer to the declaration of Mr. James Brocklebank QC dated May 15, 2020, at para. 26.

13

59. Neither arbitral tribunal has issued any order preventing the discovery sought here from being used in those proceedings.

**JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

60. As the partner globally in charge of the Swiss Litigation and LCIA Arbitrations, I have a deep understanding of the issues in each of the foreign proceedings. The information sought in the proposed subpoenas attached as Exhibit 2 and Exhibit 3 to the Declaration of Lucas Bento is highly material to the proceedings before the competent Swiss courts and LCIA tribunals.

61. Specifically, the documents that Petitioners requests in the 1782 Application will assist Petitioners' case in the Swiss Litigation and LCIA Arbitrations by helping Viasat to show that (i) the HNS agreement is indeed a Material Contract (*i.e.* a value of more than EUR 15 million over the lifetime of the contract) and thus has not been validly approved by EBI's Board (as in such case EBI's chairman has no casting vote but also the approval of at least one Viasat-designated board member is necessary) and that (ii) EBI and Eutelsat have not been transparent and may have misrepresented the circumstances leading to the execution of the HNS Supply Agreement, as well as their motivations for doing so and (iii) Eutelsat is procuring the HNS Ground Equipment to benefit Eutelsat's competing Konnect satellite. Annexed as **Appendix A** is a chart explaining the background and relevance of each document request for the Court's consideration.

62. In the Swiss Litigation, Petitioners will have the opportunity to present evidence—including documents obtained in the Section 1782 action—until the fact-finding stage of the proceedings is closed.

63. In the LCIA Arbitrations, Petitioners will have the opportunity to present evidence—including documents obtained in the Section 1782 action—at the Tribunal's discretion, which is typically until the fact-finding stage of the proceedings is closed.

## VI.  FOREIGN TRIBUNAL'S RECEPTIVENESS TO SECTION 1782 APPLICATION AND NON-CIRCUMVENTION OF SWISS PROOF-GATHERING POLICIES

64. Petitioners have no reason to believe that the Swiss courts or the LCIA tribunals would not be receptive to the judicial assistance requested in the 1782 Application, and the request does not seek to circumvent foreign proof-gathering restrictions or other policies of Switzerland or the LCIA Rules.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.

Executed on May 15, 2020
in Zurich, Switzerland.

_____
Prof. Dr. Thomas Werlen

## APPENDIX A

## BACKGROUND AND RELEVANCE OF DOCUMENT REQUESTS[2]

| No. | Request | Background | Relevance[3] |
|---|---|---|---|
| 1. | All non-privileged versions of the HNS Agreement, including drafts, execution and executed versions. | On December 11, 2019, EBI's board voted on a proposal to conclude an agreement with Hughes for EBI to buy and install ground equipment and consumer premises equipment supplied by Hughes, which based on current information available to Petitioners, was entirely unnecessary, not commercially or technically justified, will clearly result in negative financial returns to EBI, and is being procured to benefit Eutelsat's competing Konnect platform. | These documents will help Petitioners to show that the HNS Agreement is indeed a material contract (i.e. a value of more than EUR 15 million over the lifetime of the contract) and thus has not been validly approved by EBI's Board (as in such case EBI's chairman has no casting vote but also the approval of at least one Viasat-designated board member is necessary). |
| 2. | All non-privileged Communications and Documents, including term sheets, studies, documents, reports, business plans, and presentations, Concerning the HNS Agreement. | Petitioners believe that EBI's Eutelsat-designated board members (including the chairman of EBI's board) and EBI's management misrepresented to the EBI board that the total value of the HNS Supply Agreement is below the €15 million threshold which would | These documents will help Petitioners to show that (i) the HNS Agreement is indeed a material contract and has not been validly approved by EBI's Board and (ii) EBI and Eutelsat have not been transparent and may have misrepresented the circumstances leading to the execution of the HNS Agreement, as |

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in Petitioners' Application and accompanying memorandum of law.

[3] This document is intended to aid the Court in its review of the Subpoenas. The explanations proffered herein are not exhaustive, and Petitioners reserve the right to identify additional bases on which the documents sought are relevant to the foreign proceedings.

| No. | Request | Background | Relevance[3] |
|---|---|---|---|
|  |  | otherwise render it a Material Contract and that EBI's management presented financial projections to the EBI board that contained material and inaccurate statements and unrealistic assumptions about the costs and value of the HNS Supply Agreement. | well as their motivations for doing so, and (iii) Eutelsat is procuring the HNS Ground Equipment to benefit Eutelsat's competing Konnect satellite. |
| 3. | All non-privileged Communications and Documents Concerning any potential use or benefit that any equipment provided under the HNS Agreement may have for any Eutelsat operated Satellite other than the KA-SAT satellite. | Based on the limited information provided to the EBI board to date, the equipment supplied under the HNS Supply Agreement was not commercially or technically justified and will clearly result in negative financial returns to EBI, and is being procured to benefit Eutelsat's competing Konnect satellite. | These documents will help Petitioners to show that Eutelsat is procuring the HNS Ground Equipment to benefit Eutelsat's competing Konnect satellite. |